SNELL, ADMX. *v.* SNELL.

5-1494                                          312 S. W. 2d 188

Opinion delivered April 14, 1958.

*Bobbie Jean Farabee,* for appellant.

No brief filed for appellee.

J. SEABORN HOLT, Associate Justice. W. A. Snell died February 14, 1956. Lester W. Snell and Mildred Snell Harding were his adult children by his first marriage and he had a minor son, Luther, by his second marriage. About six days prior to his death W. A. Snell, while a patient in the Missouri Pacific Hospital in Little Rock, changed the beneficiary in two insurance policies in which appellant, Mrs. Snell, had been named beneficiary, — to the name of his daughter, Mildred. The two policies totaled $573.00.

In the trial court appellant, Ella Snell, contended that Mildred induced her father to make her the beneficiary in the two policies through fraud and undue influence. The court found this issue in favor of appellees, holding: "That the insurance money collected by Mildred G. Harding was properly paid to her, that there was no fraud or undue influence exercised on W. A. Snell, and that Mildred G. Harding should be given all right and title to the proceeds from" the insurance policies. From the decree comes this appeal.

For reversal appellant relies on these points: "1. That the testimony adduced by the appellee, Mildred G. Harding was general, evasive and highly improbable and insufficient to support the decree. 2. The evidence of the appellee, if given its greatest probative value, is insufficient to support the decree," and says "Appellant herein takes this appeal from that portion of the decree of the court finding that no undue influence was exercised by Mildred Harding to induce W. A. Snell to make her beneficiary of his insurance policies at a time when he was on his deathbed and had not visited with or spoken to her in ten years."

The burden of proof was on appellant. After a careful review of all the evidence, we have concluded that the findings of the trial court are not against the preponderance of the testimony.

Mildred had been a widow for about ten years prior to her father's death. She visited him twice while he was in the hospital and it was on her second visit that the beneficiary in the policies was changed. She testified: "Q. Did you say anything to him about his insurance? A. No, sir. Q. How did the change in beneficiary to your benefit occur? A. Well, I believe it was on my second visit. When I was leaving a man came into the room and my father said 'Don't go, this concerns you.' That was the first time I knew about it. Q. Did you at any time while you visited there with him ask him to change it? A. Goodness no. I wouldn't ask him because I did not know about it. Q. Did you consider that you had any particular influence over your father? A. Why goodness no, not after all those years I did not. Q. Did you call any of the insurance companies and ask them to come out? A. No. Q. Do you know who did make the call? A. Well I believe that Mr. Roberts called . . . Q. And did your father know what — seem to know what he was doing when he talked to you? A. Oh goodness yes. Q. Mentally he seemed to be about normal? A. Yes, in fact I was surprised because he was so alert. Q. Had he already had this insurance — these insurance policies, the

beneficiary under these two policies which he changed over to you — had it already been transferred, the beneficiary that day, the last trip you made to see him? A. I don't know because he did not talk anything to me about those. Q. Did he give you the policies? A. No all the man had was just a receipt, I guess . . . Q. And what happened there at that time about the policies? A. Well, when I was getting ready to leave and my father said for me to stay, that it concerned me. Q. What else did he say about it? A. That is all it was. They went on with their business. Q. Did you understand what they were talking about? A. Not exactly. I did not realize until daddy said it concerned me and he said 'I am going to make this policy over to you.' " Only Mildred and the insurance agent were present when the change was made.

W. B. Roberts, a disinterested witness, testified: "A. I visited W. A. Snell at the Missouri Pacific Hospital where he was being hospitalized on account of a heart attack. He asked me to call the insurance agent and ask him to come to the hospital that he might have the two insurance policies changed so as to make his daughter, Mrs. Mildred Harding, his beneficiary. I complied with his request. Q. In what way did you assist him, if your answer to the preceding question is in the affirmative? A. I called the insurance agent and asked him to come to the Missouri Pacific Hospital so that W. A. Snell might discuss business with him. Q. Did he discuss any other business matters with you, and if so, will you explain in detail. A. He also stated to me that he planned to have his postal savings made payable to his son, Lester Snell, and daughter, Mrs. Mildred Harding, when he was able to leave the hospital. He stated that his wife was fixed all right financially and didn't need the money. Q. How long had you known W. A. Snell prior to his death? A. I had known Mr. W. A. Snell for approximately thirty years. Q. In your opinion, what was his mental condition at the time he discussed his business with you and what was his mental condition up to the time of his death? A. It is my sincere opinion that Mr. Snell was of sound mind and knew what he was

doing at the time he made these beneficiary changes. Also being in sound mind until the time of his death.''

On the question of undue influence, fraud and mental capacity, we have many times announced the governing rule as follows: "If the maker of a deed, will or other instrument has sufficient mental capacity to retain in his memory, without prompting, the extent and condition of his property, and to comprehend how he is disposing of it, and to whom, and upon what consideration, then he possesses sufficient mental capacity to execute such instrument. Sufficient mental ability to exercise a reasonable judgment concerning these matters in protecting his own interests in dealing with another is all the law requires. If a person has such mental capacity, then, in the absence of fraud, duress, or undue influence, mental weakness whether produced by old age or through physical infirmities will not invalidate an instrument executed by him.'' *Ebrite* v. *Brookhyser*, 219 Ark. 676, 244 S. W. 2d 625.

There was evidence offered by appellant which she argues tended to contradict that of appellees, some of which she abstracts as follows: "Lester Snell (twin brother of Mildred) admitted that he (his father) was breathing laboriously, and a totally disinterested witness, T. L. Hendricks, stated that he did not look well, did not feel good and was worried. Hendricks went on to testify that Snell did not seem anything like his normal self and stated to him (Hendricks) that his daughter was worrying him.''

It appears that appellant does not specifically question W. A. Snell's mental capacity. However, as indicated, when this testimony, along with the other testimony, which we find to be no stronger, is weighed and considered we hold that it falls short of showing that W. A. Snell was induced by fraud or undue influence to change the beneficiary. We cannot say that the findings and decree of the court were against the preponderance of the evidence.

Affirmed.